A02A0856. URRUTIA v. JEWELL.
(572 SE2d 405)

SMITH, Presiding Judge.

A jury awarded Tamasine Jewell $150,000 in actual damages and $250,000 in punitive damages on her fraud claim against Norman Urrutia and three other defendants. In this appeal, Urrutia alone challenges an evidentiary ruling that allowed evidence about his prior similar business dealings. Urrutia also claims that the trial court erred in refusing to grant his motion in limine to exclude evidence about his Florida criminal convictions and erred by denying his motion for mistrial after that evidence was introduced. Because we find no error in these three rulings, we affirm.

When viewed in the light most favorable to the verdict, the evidence shows that Jewell advanced $40,000 to Penco Industries, Inc. ("Penco") and invested $60,000 in Tampeco, Inc. ("Tampeco"). Tampeco was formed by Lee Preston and Jewell to develop and operate a nationwide network of Montego Pool dealers. The plan called for the dissolution of Penco whereupon Tampeco would own the name Montego Pools.

At the time of the formation of Tampeco, Lee P. Preston, a/k/a Penny Preston, a/k/a Penny Urrutia, was married to Norman Urrutia. According to Jewell, Urrutia told her, Jewell, that "he had been very successful all over the country" as a pool builder. Jewell testified that Urrutia represented himself as the owner of a substantial estate, various pieces of heavy equipment, and other assets.[1] Urrutia also told her that he was in the process of purchasing property in Forsyth County located on Misty Cove Lane.

Urrutia presented Jewell with a business proposal that indicated that the new business entity would operate as a management company to promote and market Montego Pools while receiving a five percent administrative fee from each Montego swimming pool. The prospectus, using figures denoted as "considerably conservative," estimated a "FIRST YEAR PROJECTED NET INCOME [of] $206,000.00." Before infusing her funds into the venture, Jewell flew to Texas to see Urrutia's pool building business in operation. Afterward, relying upon their representations, Jewell went into business with Urrutia and Preston. Shortly after Tampeco's creation, Urrutia became its vice president.

Despite Jewell's investment of $100,000, Tampeco remained in operation only for three months and closed down without making a profit. During that interval, Jewell became increasingly concerned about being "locked out of the decision-making." Despite her repeated requests, the books and records, however, were incomplete and unavailable for inspection. Finally, accompanied by her attorney, Jewell personally confronted Urrutia and Preston to ask to see the company books but was refused.

Unable to obtain a refund or the return of her money, Jewell sued Urrutia, Preston, and Penco. Jewell alleged that Urrutia and Preston had made material misrepresentations to her as to personal and corporate assets, creditworthiness, control of the name "Montego Pools," and Urrutia's ability to conduct business without breaching prior agreements with competitors. Jewell later amended her complaint to add claims for fraud and diversion of funds. Jewell asserted that Urrutia and Preston had acted in concert with Preston's father,

---

[1] Urrutia had filed bankruptcy in 1992, the previous year.

Donald Wean, to "divert [her] funds into the purchase of certain real property to wit: Misty Cove Lane [legal description]."

By motion, Jewell added Wean as a defendant in this action, and she then obtained a default judgment against him.[2] Wean entered into a settlement with Jewell under which Jewell accepted title to the Misty Cove Lane property in exchange for releasing her claims against him.[3] On August 10, 1995, Wean deeded the Misty Cove Lane property to Jewell. The warranty deed between Wean and Jewell for the property known as Misty Cove Lane was recorded in Forsyth County on September 29, 1995. On the same day that Wean provided the warranty deed to Jewel, Urrutia asked Carol Couch, a ReMax agent, to notarize a quitclaim deed purportedly from Wean to Urrutia for the same property. Couch testified that when Urrutia approached her and asked her to notarize the document, the signatures were already in place with Wean as the first party and Preston as the witness to both signatures. According to Couch, when she notarized the quitclaim deed, she assumed that Preston and Wean had signed it and did not verify that they had done so. During cross-examination at trial, Urrutia admitted having signed his wife's and Wean's names to the quitclaim deed. He claimed to have executed the quitclaim at Wean's suggestion. The quitclaim deed was recorded in Forsyth County on August 11, 1995. When Jewell recorded her warranty deed, she discovered the quitclaim deed.

At trial, Jewell testified that despite her status as corporate president, when she made inquiries to Urrutia and Preston, her calls were not returned, and "eventually [Penny] wasn't even allowed to call me back." She claimed that her efforts to examine the company's books and to obtain weekly reports were repeatedly rebuffed. Jewell testified that she began to question the activities of Urrutia and Preston after she "started receiving phone calls from homeowners, subcontractors, suppliers, [and] district attorneys in the State of Texas." According to Jewell, "irate customers and subs" in Texas contacted her to find out why pools were not being completed and why subcontractors were not being paid when the homeowners had already paid Montego Pools. Jewell testified that when she began to suspect "some sort of illegal and unethical" conduct, she confronted Urrutia and Preston to try to obtain "some form of accounting." Jewell was forced to retain counsel in Texas to defend against two lawsuits filed against her as president of Tampeco. The thrust of the

---

[2] On his loan application to purchase Misty Cove, Wean claimed to be a salaried employee of Penco and to have $22,000 in an employee savings plan. None of these claims were true.

[3] Jewell testified that Urrutia filed a lis pendens against the Misty Cove Lane property and she had not been able to sell it.

Texas suits was that the homeowners had paid Montego Pools for swimming pools, some of the work was done, but subcontractors remained unpaid.

By motion in limine, defense counsel argued that there should be no mention that Urrutia was a convicted felon because Urrutia had obtained Florida's equivalent to first offender treatment for his crimes. Defense counsel also objected to any mention in opening statements "about my client being a convicted felon."

However, the plaintiff's portion of the consolidated pretrial order notified Urrutia that a certified copy of his convictions in Florida as well as the forged deed to Misty Cove Lane that Urrutia executed might be introduced in evidence. The Florida records documented that in the Circuit Court of Palm Beach County, Florida, on December 23, 1982, Urrutia had entered a guilty plea to four counts of embezzlement. Each of the four counts alleged that Urrutia had acted with an intent to defraud when he obtained payments from property owners for improving real property and then had used the proceeds "for a purpose other than to pay for labor or services performed on or materials furnished for this specific improvement, while the amount for such labor, services or materials remained unpaid, contrary to F.S. 713.34 (3) and F.S. 812.014 (1) (2) (b)." Urrutia was also charged in Florida with two counts of perjury for testifying falsely in two affidavits, but the disposition of those charges is not clear. A Florida circuit court judge sentenced Urrutia to five years supervised probation to run concurrently on each of the four counts of embezzlement.

When Urrutia opposed the introduction of his Florida convictions, Jewell's counsel presented the trial court with certified copies of those convictions. After reviewing the documents, the trial court determined that despite Urrutia's claim to the contrary, the convictions did not show first offender treatment or that an adjudication of guilt had been withheld. Defense counsel then responded, "Okay. Well, for the record, we would note our objection to that, to it being referenced in opening statements and during the trial."

1. Urrutia contends that the trial court erred in allowing evidence about prior dealings with third parties that were entirely separate and distinct from the transactions at issue. He asserts that the trial court erred in denying his motion in limine to exclude evidence of his criminal convictions in Florida. We disagree.

Urrutia's Florida convictions involved conduct remarkably similar to that in which Urrutia had purportedly engaged in Texas. In any event, in civil cases in Georgia, proof of a conviction for a felony or for any crime involving moral turpitude is generally admissible to impeach a witness. *O'Neal v. Kammin*, 263 Ga. 218, 219 (430 SE2d 586) (1993); *McNeely v. Wal-Mart Stores*, 246 Ga. App. 852, 853 (a)

(542 SE2d 575) (2000). "[T]he offenses of obtaining money from another by fraud or false pretenses or larceny after trust [are] crimes malum in se, involving moral turpitude." (Punctuation omitted.) *Carruth v. Brown*, 202 Ga. App. 656, 658 (415 SE2d 470) (1992). "[A] crime involving dishonesty is considered to be one involving moral turpitude." (Citation and punctuation omitted.) *Lewis v. State*, 148 Ga. App. 16, 17 (1) (251 SE2d 18) (1978). Here, Urrutia was convicted in Florida of four counts of embezzlement, all of which were felony offenses. Embezzlement is a crime of dishonesty and consequently is a crime of moral turpitude. *Johnson v. Ray*, 206 Ga. App. 262, 263 (4) (424 SE2d 892) (1992); see *Lewis*, 148 Ga. App. at 17 (1). "The fact that a witness has been convicted of a crime involving moral turpitude is admissible for the purpose of discrediting his evidence." (Citations and punctuation omitted.) *McNeely*, 246 Ga. App. at 853 (a). No error occurred in the admission of this evidence.

2. Urrutia claims that the trial court erred in denying his motion for mistrial after Jewell's counsel characterized him as "a convicted perjurer." He argues the characterization was inaccurate, inflammatory, and highly prejudicial.

The denial of a motion for mistrial lies within the discretion of the trial court, and its ruling will not be disturbed when sufficient remedial measures are taken to ensure a fair trial. *McCoy v. State*, 273 Ga. 568, 572 (9) (544 SE2d 709) (2001). Here, after denying the motion, the trial court crafted an instruction to restrict the purpose for which the jury could consider Urrutia's prior convictions. The trial court then advised the jury,

> Now, there were statements made by [plaintiff's counsel] in his opening about Mr. Urrutia being convicted of perjury. The documents do not indicate that he has been convicted or pled guilty to the offense of perjury, and I'm going to strike that from the evidence. You should not consider that statement or any other statements about Mr. Urrutia having previously been convicted of perjury.

After the curative instruction, however, Urrutia failed to object or renew his motion for mistrial. This inaction resulted in waiver of the issue. *Carnes v. Woodall*, 233 Ga. App. 797, 800 (2) (505 SE2d 537) (1998). In any event, because the remedial measures were sufficient to ensure a fair trial, the trial court did not abuse its discretion in denying the motion. See *Johns v. State*, 274 Ga. 23, 25 (3), (4) (549 SE2d 68) (2001).

3. Jewell seeks the imposition of sanctions against Urrutia. She points out that the legal precedent applicable to the issues raised by Urrutia is so clearly established as to show that his appeal was frivo-

lous and posed strictly for purposes of delay. We agree and note that nowhere in his supplemental brief does Urrutia even respond to the request for sanctions.

Jewell filed suit in July 1993. The record amply documents the protracted nature of the litigation and the persistent pattern of delay on the part of Urrutia.[4] See *Wade v. Howard*, 232 Ga. App. 55, 60-61 (499 SE2d 652) (1998). Accordingly, we assess frivolous appeal penalties pursuant to Court of Appeals Rule 15 (b), in the amount of $1,000 to be paid in equal parts by Urrutia and his appellate counsel. Upon return of the remittitur, the trial court is directed to enter a $1,000 judgment in favor of Jewell in the form of a $500 penalty against Urrutia and a $500 penalty against his appellate counsel. See *Cavin v. Brown*, 246 Ga. App. 40, 44 (4) (538 SE2d 802) (2000).

*Judgment affirmed. Eldridge and Ellington, JJ., concur.*

DECIDED OCTOBER 11, 2002.

*Robert P. McFarland*, for appellant.
*Douglas R. Daum*, for appellee.

---

[4] After Jewell filed suit, the trial court appointed a receiver. Afterward, the trial court entered a finding that the defendants "have failed to comply with the court's order appointing George W. Murphy as receiver, and have failed to cooperate with said receiver in the performance of his authorized duties." In addition to failing to cooperate with the receiver, the record also shows that Jewell had to obtain a special process server for Wean; one week after entry of the pretrial order and two years after the litigation began, Urrutia filed a motion to dismiss or for a more definite statement; and Urrutia failed to appear at a scheduled deposition.